In the Matter of the Marriage of

MORTEN,
*Appellant,*
*and*

MORTEN, nka Buffaloheart,
*Respondent.*

(D8005-63689; CA A27117)

677 P2d 735

Ira L. Gottlieb, Portland, argued the cause and filed the brief for appellant.

Robert M. Atkinson, Salem, argued the cause and filed the brief for respondent.

Before Joseph, Chief Judge, and Warden and Young, Judges.

WARDEN, J.

## WARDEN, J.

In this proceeding we review *de novo* and reverse the trial court's denial of father's motion to change custody of the parties' children, a boy age seven and a girl age five, from mother to him. We order a change of custody, because mother's recent remarriage has created a substantial potential for serious harm to them and father can provide a safe and stable environment for the children.

Father is a school teacher and coach. He has remarried. His present wife has three children by a previous marriage, two of whom are over age 18. She is studying to become a nurse. Father has contributed to support the two children of the marriage since he and mother separated and has faithfully exercised his visitation rights with the children, missing only two scheduled visits. The trial court found him to be a good father.

Mother has been a teacher but was working the graveyard shift in a Salem cannery at the time of the hearing. The trial court found her to be a good mother and continued her custody of the children despite its expressed misgivings about her new husband.

Mother met Edwin Buffaloheart during a visit to the Oregon State Penitentiary made in 1980 as part of a college course she was taking. He has been in Corrections Division custody all the time mother has known him. He is in his early forties and has spent most of his life in institutions as the result of apparently alcohol-related delinquencies and crimes. His record consists of 15 convictions for crimes, including robbery, assault and attempted rape. Therapists who have treated him conclude that he has an assaultive personality, particularly when under the influence of alcohol, and that he cannot control his drinking. Although he has a good record as a prisoner, he is by no means rehabilitated, and while undergoing therapy has demonstrated abusive and aggressive behavior toward others in his group.

Mother takes the children to see Buffaloheart on her visits with him in prison, and he stays with her and the children when he is on temporary release from prison. He takes a parental role with the children. He bruised the boy's back one day while taking care of the children. The bruises

were still evident and distinct enough to show up on a photograph taken two days after the incident. The incident fairly allows the inference that Buffaloheart lacks judgment in dealing with children and may have difficulty in controlling the force he uses while playing with a small child so as to avoid injury. It may also indicate that the children, if they remain with mother while she is involved with Buffaloheart, are at risk of a sudden violent blowup of the sort to which he has been historically prone. We see that risk as a serious problem in continuing custody in mother.

Dr. Lazere, a clinical psychologist who examined the children, testified that the little girl said "that [her brother] had been beaten up by Mr. Buffaloheart" and that he " 'might beat up Mom' " and that her brother expressed "concerns about Mr. Buffaloheart beating him up." In kinetic family drawings, both children indicated to him their feeling of closeness to their father. Dr. Lazere saw "strength and ability and commitment in the Morten family to provide a stable and secure home."

Records of the Oregon State Hospital show that on Buffaloheart's discharge from Cornerstone, a drug and alcohol abuse program, in July, 1982, his condition was "not improved," and the final diagnoses included "[a]lcohol dependence, continuous and [a]ntisocial personality disorder." He admits having had "a few drinks" approximately one month after his marriage to mother.

Mother apparently married Buffaloheart in part because she believed that the marriage would aid in his rehabilitation. That may be, on her part, laudable. However, the danger that someone with his history will have relapses in the course of even an eventually successful rehabilitation is too great. His record in treatment programs and his performance during at least one temporary release provide evidence of that danger. Also, of course, rehabilitation may be unsuccessful. For mother to expose herself to the risks of potentially violent episodes is a decision she has the right to make. She does not have the right, however, to expose her children to those risks. Mother, as an adult, may be able to cope with the physical and emotional problems that are apt to arise or may be able to find help in dealing with those problems with which she cannot cope alone. Such incidents are unlikely to have a

permanent damaging effect on her. The children are much more likely to be damaged emotionally and physically. The potential for damage to them and the likelihood of damage occurring are too great to continue their exposure to it by requiring them to stay with her.

■ ■     Although remarriage by itself does not justify a change of custody, *Padbury and Padbury,* 46 Or App 533, 612 P2d 321 (1980), remarriage may create a significant change of circumstances justifying a new look at custody.[1] *Greisamer and Greisamer,* 276 Or 397, 555 P2d 28 (1976). Mother's remarriage, bringing into the family of these young children a husband with an extensive record of assaultive crimes, creates such a significant change. The trial judge expressed his misgivings at leaving custody of the children with mother in the presence of her new husband, saying:

> "What if I'm wrong? What if [Buffaloheart] does get out in nine months, and what if he does do this, and if he's a role model that puts bruises, that does this or that? I don't know. I don't know the answer to that. I have to guess. I have to surmise, and all I can tell you is that I pray to God that I hope I'm not wrong. * * *"

His misgivings are well justified; ours are even stronger. On the record before us, custody in the safe and stable home of father, with reasonable visitation by mother, is in the children's best interests.

Decree modified; custody awarded to father; remanded for determination of a visitation schedule. Costs to appellant.

---

[1] Our review is based on the record made in the trial court. We decline mother's request that we take judicial notice that, after oral argument on this appeal, her marriage to Buffaloheart was dissolved. While we have the authority to take judicial notice of this alleged fact, OEC 201(f), we would not know how to evaluate it, for we do not know how, or if, the dissolution has altered mother's situation or the children's environment. A dissolution of the marriage does not necessarily mean that he is out of mother's life. If mother believes that events since the hearing are relevant to the children's custody status, she should bring those events to the attention of the trial court in an appropriate fashion.